**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PATRICE BJORNSTAD as trustee of THE THOMAS AND ISIS DAVIDSON FAMILY TRUST, on behalf of ISIS DAVIDSON,<br><br>Plaintiff,<br><br>vs.<br><br>SENIOR AMERICAN LIFE INSURANCE COMPANY, a foreign corporation; BLACK CORPORATIONS I-X; WHITE PARTNERSHIPS I-X; JOHN DOES I-X; and JANE DOES I-X,<br><br>Defendants. | No. CV-08-00248-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the Motion for Summary Judgment of Defendant Senior American Life Insurance Company (Dkt. # 25) and the Motion for Partial Summary Judgment of Plaintiff Patrice Bjornstad, as trustee of the Thomas and Isis Davidson Family Trust, on behalf of Isis Davidson (Dkt. # 26). For the following reasons, the Court denies Defendant's motion and grants Plaintiff's motion in part and denies it in part.

**BACKGROUND**

Effective March 20, 2002, Ms. Isis Davidson obtained a "Home Health Care Insurance Policy" ("the Policy") from Defendant. (Dkt. # 29 Ex. A at 1.) The Policy provides for payment of health care benefits (but not residency charges) to Ms. Davidson if she is unable

1  to perform two or more activities of daily living or is afflicted with cognitive impairment.
2  The parties agree that Ms. Davidson is currently unable to perform two or more activities of
3  daily living and that Ms. Davidson has made all premium payments required for coverage
4  under the Policy.

5        To be eligible for benefits under the Policy, however, Ms. Davidson must also be
6  living in her "Home." "Home" is defined as "Your personal residence, whether it be in a
7  private dwelling, or a home for the retired or aged. It does not include a hospital, sanitarium
8  or Nursing Facility." (*Id.* at 5.) The term "Nursing Facility" appears in bold print in the
9  Policy, which elsewhere provides that "important words and terms appear in bold print.
10 They appear in bold print where they are defined." (*Id.*) Defendant agrees that, according
11 to this language, bolded terms are to be defined in the Policy. (Dkt. # 29 Ex. R at 2.) The
12 Policy, however, provides no definition of "Nursing Facility."

13       On October 15, 2002, Ms. Davidson, who has a medical history of mental
14 deterioration,[1] began living at Merrill Gardens, an assisted living facility. While living there,
15 Ms. Davidson received assisted living services. On April 9, 2006, Ms. Davidson fell and was
16 hospitalized. Doctors determined that she would thereafter require continuous care. Ms.
17 Davidson returned to Merrill Gardens on April 14, but she stayed only four more days.

18       On April 18, 2006, Ms. Davidson moved into Legacy Village in Mesa, where she
19 continues to reside.[2] Legacy Village is a center for directed care that does not have an
20 independent living section. According to its Executive Director, it is licensed to operate as
21 an assisted living facility and "is not licensed to operate as a Nursing Facility." (Dkt. # 29
22 Ex. K at 1.) The Executive Director has further testified that "Legacy Village does not
23 provide skilled nursing care to [Ms.] Davidson," "does not provide skilled nursing care to

---

[1] Plaintiff characterizes Ms. Davidson as suffering from Alzheimer's Disease, while Defendant asserts that she suffers from dementia.

[2] At the time she relocated, Legacy Village was known as Encore Senior Village. It has since been renamed Legacy Village.

- 2 -

1  any of its residents," and "is not permitted to provide skilled nursing care to [Ms.] Davidson
2  or any [of] its residents" under Arizona law. (Dkt. # 38 Ex. T at 1-2.)

3    Around the time Ms. Davidson moved into Legacy Village, Plaintiff contacted
4  Defendant about receiving benefits under the Policy. The parties dispute exactly what
5  transpired during that phone call, as well as the precise nature of the communications
6  between them throughout 2006 and the first half of 2007. Plaintiff states that in the initial
7  phone call a representative of Defendant advised her that Ms. Davidson would only be
8  eligible for benefits if she lived in a home that she owned. (Dkt. # 29 Ex. B at 2 ¶ 11.)
9  Defendant points out that its call log states that Plaintiff was advised that "care must be
10 provided in [the] insured's personal residence," which does not necessarily mean a home that
11 is owned, and that Defendant's call log for the day in question does not report the statement
12 that Plaintiff claims was made. (Dkt. # 35 Ex. B at 7.)

13   Seeking coverage, Plaintiff made further phone calls to Defendant's customer service
14 department throughout April and May of 2006. Although the reasons are not entirely clear
15 from the record, the Policy was thereafter cancelled. The cancellation was backdated to
16 April 14, the date Ms. Davidson left the hospital following her fall. Plaintiff characterizes
17 the cancellation as being the result of Defendant's misrepresentations, a notion Defendant
18 disputes, although neither party elaborates on the point further. Following further
19 communication between the parties, Defendant reinstated the policy on October 13, 2006.

20   Plaintiff apparently continued to pursue coverage under the Policy, for in a letter dated
21 November 27, 2006, one of Defendant's claims managers wrote to Plaintiff:

> The invoices submitted from [Legacy Village] state a monthly "Rent" charge of $3,695 . . . . Based on these invoices we are unable to determine what percentage of this charge is for Home Health Care versus the charge for room and board. In order to fully evaluate this claim for benefits we have requested additional documentation from [Legacy Village]. . . .
>
> Upon receipt of this documentation we will give this claim our prompt attention and advise you of our claim determination.

- 3 -

1  (Dkt. # 29 Ex. E at 1-2.) Plaintiff characterizes this letter as a de-facto denial based on the
2  supposed inability to segregate residence and health care charges. Defendant views it simply
3  as a request for further documentation.

4  In another letter, dated December 27, 2006, Defendant stated:

> Mrs. Davidson entered [Legacy Village] at the "Basic Care" level which suggests a minimal amount of care required. As her care needs increase and she requires "Intermediate Care" and/or "Advanced Care" as indicated in the brochure from Legacy Village, she will not incur a charge for the increased level of care.
>
> Mrs. Davidson's policy is a Home Health Care policy which will not pay benefits for charges for rest care, hotel or retirement expense or other expenses which are related to the insured's residence and not their health.
>
> Based on the documentation submitted, we are unable to extend benefits for Home Health Care when the charges incurred are for the insured's residence.

13 (Dkt. # 29 Ex. F at 1.) Plaintiff views this as a denial under a new theory propounded by
14 Defendant that all of Ms. Davidson's charges relate to residential costs and none relate to
15 health care costs. Defendant disagrees, stating that the letter was simply "explaining that
16 under the terms and conditions of eligibility of the policy [Defendant] was unable to extend
17 benefits for charges incurred for the insured's residence rather than for her health." (Dkt. #
18 35 at 6.)

19 Defendant does agree, however, that it denied benefits on January 15, 2007, on the
20 ground that Ms. Davidson's charges at Legacy Village were related to residence rather than
21 health care. The letter denying benefits relies on precisely the same reasoning as the letter
22 Defendant sent on December 27, 2006. (Dkt. # 29 Ex. G at 1.) In fact, the January 15 letter
23 refers Plaintiff back to the December 27 letter.

24 Plaintiff continued to pursue benefits under the Policy, sending Defendant a
25 breakdown of Ms. Davidson's health care and residential costs at Legacy Village. On May
26 11, 2007, Defendant wrote back to Plaintiff that "as [Legacy Village] is not an independent
27 living facility, I fail to see how home health care is applicable" and that "Mrs. Davidson, by
28 your admission, entered Legacy Village unable to perform at least three activities of daily

- 4 -

1 living. Obviously, she was not then nor is she now capable of independent living in her own
2 personal residence." (Dkt. # 29 Ex. I at 1.) Plaintiff describes this letter as a denial under
3 the theory that Ms. Davidson was incapable of independent living in her personal residence.
4 Defendant responds that "the letter simply points out that [Ms.] Davidson, at the time she
5 entered [Legacy Village,] was not then, nor is she now, capable of independent living in her
6 own personal residence," and that the letter does not actually deny coverage on that basis.
7 (Dkt. # 35 at 6.)

8 The same letter also states that "the reinstated policy only covers loss due to sickness
9 beginning more than ten days after the date of reinstatement. . . . Kindly keep this in mind
10 when pursuing any claimed coverage." (Dkt. # 29 Ex. I at 2.) Plaintiff views this as
11 Defendant's threat to preclude further claims by suggesting that the pre-existing condition
12 limitation was reset as of the date the policy was reinstated. Defendant says that the letter
13 "merely points out the provision regarding pre-existing conditions," and that the letter does
14 not imply that further claims would be denied on that basis. (Dkt. # 35 at 7.)

15 Finally, on July 31, 2007, Defendant denied coverage under the reasoning that Legacy
16 Village is a "nursing facility," and thus not a "home" as required by the Policy. (Dkt. # 29
17 Ex. J.) On January 28, 2008, Plaintiff filed the complaint underlying this action in Maricopa
18 County Superior Court. (*See* Dkt. # 2.) Therein, Plaintiff made five claims against
19 Defendant: count one, for a declaratory judgment that Ms. Davidson is entitled to receive
20 Homemaker/Companion Care benefits under the policy; count two, breach of contract for
21 failing to pay benefits; count three, a contract claim for breach of the implied covenant of
22 good faith and fair dealing; count four, a tort claim for breach of the implied covenant of
23 good faith and fair dealing; and count five, a claim for punitive damages. (*Id.* at 4-9.)
24 Defendant removed the case to this Court on February 7, 2008. (Dkt. # 1.) The Court has
25 diversity jurisdiction pursuant to 28 U.S.C. § 1332 (2006).

26
27
28

**DISCUSSION**

**I.      Legal Standard**

Summary judgment is appropriate if the admissible evidence, viewed in the light most favorable to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). The moving party bears the initial burden of supporting its contention that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The burden is then on the nonmoving party to establish that a genuine issue of material fact exists. *See id.* Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Similarly, the dispute must be genuine; that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**II.      Analysis**

Defendant argues that Plaintiff's entire case must be dismissed because: (A) Legacy Village is a "nursing facility," Ms. Davidson's care there is thus not covered under the Policy, and therefore her claims for declaratory judgment and breach of contract must fail; (B) Plaintiff cannot make out a claim for bad faith; and (C) Plaintiff cannot make out a claim for punitive damages. Plaintiff disputes each of these arguments, and she makes her own request for summary judgment, asserting that the Court should find that Ms. Davidson is entitled to benefits as a matter of law, and on that basis enter summary judgment on the declaratory judgment and breach of contract claims. The Court will address each argument in turn.

**A.      Declaratory Judgment and Breach of Contract**

The main question before the Court is whether the term "nursing facility" as used in the Policy covers Legacy Village. If it does, then Ms. Davidson is not living in a "home" and thus would not be entitled to benefits under the Policy. If the term "nursing facility" does

1 not cover Legacy Village, however, then Defendant has set forth no basis in the policy on
2 which coverage could be denied.

3   "The interpretation of a contract is a matter of law and not a question of fact." *Divizio*
4 *v. Kewin Enters., Inc.*, 136 Ariz. 476, 480, 666 P.2d 1085, 1089 (Ct. App. 1983). "Contracts
5 are to be read in light of the parties' intentions as reflected by their language and in view of
6 all circumstances; if the intention of the parties is clear from such a reading, there is no
7 ambiguity." *Harris v. Harris*, 195 Ariz. 559, 562, 991 P.2d 262, 265 (Ct. App. 1999).
8 However, an agreement is ambiguous "if the language can reasonably be construed in more
9 than one sense and the construction cannot be determined within the four corners of the
10 instrument." *J.D. Land Co. v. Killian*, 158 Ariz. 210, 212, 762 P.2d 124, 126 (Ct. App.
11 1988). "In determining whether ambiguity exists in a policy, language should be examined
12 from the viewpoint of one not trained in the law or the insurance business." *Ariz. Prop. &*
13 *Cas. Ins. Guar. Fund v. Dailey*, 156 Ariz. 257, 258, 751 P.2d 573, 574 (Ct. App. 1987)
14 (quoting *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132
15 (1982)). "If a clause appears ambiguous, we interpret it by looking to legislative goals, social
16 policy, and the transaction as a whole. If an ambiguity remains after considering these
17 factors, we construe it against the insurer." *First Am. Title Ins. Co. v. Action Acquisitions,*
18 *LLC*, 218 Ariz. 394, 397, 187 P.3d 1107, 1110 (2008).[3]

19   In this case, the term "nursing facility" certainly "appears ambiguous." *See id.* The
20 Policy contains no definition of the term and no examples of what would qualify as a
21 "nursing facility." Moreover, the fact that the Policy provides that the term will be defined,

---

[3]Some older Arizona cases had suggested that Arizona "abandoned" this approach, *see Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984); *Campbell v. Farmers Ins. Co. of Ariz.*, 155 Ariz. 102, 107-08, 745 P.2d 160, 165-66 (Ct. App. 1987), but the Arizona Supreme Court has recently clarified that the rule remains in force, *see First Am.*, 218 Ariz. at 397, 187 P.3d at 1110 ("The court of appeals erred in saying that we have 'abandoned' the rule that ambiguities are construed against the insurer. That rule remains; we simply do not resort to it unless other interpretive guides fail to elucidate a clause's meaning.").

1   and yet fails to define it, weighs in favor of a finding of ambiguity, as that suggests that the
2   term was intended to have a specific and precise definition which, for whatever reason, was
3   excluded. The undefined term "nursing facility" could logically refer to any facility in which
4   nurses provide their services, it could refer to only those facilities specifically licensed by the
5   state as nursing facilities, or it could have another meaning, such as any facility operated for
6   the primary purpose of providing nursing or medical services. Thus, "the language can
7   reasonably be construed in more than one sense and the construction cannot be determined
8   within the four corners of the instrument." *J.D. Land*, 158 Ariz. at 212, 762 P.2d at 126.

9   The Court therefore must look to "legislative goals, social policy, and the transaction
10  as a whole" to determine whether the ambiguity can be resolved or whether the term is
11  actually ambiguous. *First Am.*, 218 Ariz. at 397, 187 P.3d at 1110. The first factor,
12  legislative goals, does not resolve the ambiguity. There are no Arizona statutes directly on
13  point in this matter, nor is there any indication that the Arizona legislature intended for such
14  a term to have a specific meaning. The closest applicable statutory term to a "nursing
15  facility" in Arizona is a "nursing care institution," which is an institution or other place
16  "operated for the express or implied purpose of providing care to persons who need nursing
17  services on a continuing basis but who do not require hospital care or care under the daily
18  direction of a physician." Ariz. Rev. Stat. § 36-446(8) (2003). The parties agree, however,
19  that Legacy Village is not licensed as, nor does it constitute, a "nursing care institution."
20  Rather, Legacy Village is licensed as an "assisted living facility," which is "a residential care
21  institution, including an adult foster care home, that provides or contracts to provide
22  supervisory care services, personal care services or directed care services on a continuous
23  basis." Ariz. Rev. Stat. § 36-401(A)(8) (Supp. 2008). Defendant further acknowledges that
24  the Policy provides coverage for persons in at least some assisted living facilities, as it agrees
25  that Ms. Davidson would be eligible if she remained at Merrill Gardens. (Dkt. # 29 Ex. L

1  at 6.) Thus, to the extent that the Arizona Revised Statutes are on point, they suggest that
2  Legacy Village is not a "nursing facility" and that coverage should still be available.[4]

3  The second factor, social policy, also does not resolve the ambiguity. Neither party
4  offers any argument regarding social policy, and the Court discerns none that operates at the
5  specific level of defining the term "nursing facility." The most relevant public policy
6  consideration is that underlying the need for clarity in insurance contracts. Insurance
7  contracts are contracts of adhesion in which the prospective insured have no bargaining
8  power to negotiate terms – they must, essentially, "take it or leave it." When the drafter of
9  such a contract leaves an important term undefined, public policy deems that the
10 consequences of the imprecise drafting should fall on the party that drafted the contract, was
11 able to dictate the terms, has experience in the insurance field, and (almost always) has at its
12 disposal a battery of personnel to serve its interests. *See* Restatement (Second) of Contracts
13 § 206 cmt. a (1981) (explaining the rationale behind the rule that ambiguity should be
14 construed against the drafting party). "Indeed, [the drafter] may leave [the] meaning
15 deliberately obscure, intending to decide at a later date what meaning to assert. In cases of
16 doubt, therefore, so long as other factors are not decisive, there is substantial reason for
17 preferring the meaning of the other party." *Id.*; *cf. Roberts v. State Farm Fire & Cas. Co.*,
18 146 Ariz. 284, 286, 705 P.2d 1335, 1337 (1985) ("[I]f an insurer wishes to limit its liability,
19 it must employ language in the policy which *clearly and distinctly* communicates to the
20 insured the nature of the limitation.") (emphasis added). Thus, to the extent public policy

---

[4]Defendant also points out that the federal Public Health and Welfare Code provides a broad definition of "nursing facility." *See* 42 U.S.C. § 1396r(a)(1)(C) (Supp. 2008). Defendant, however, does not explain why a definition in the federal Public Health and Welfare Code should have any bearing on this case. Regardless, to qualify as a "nursing facility" under that section an institution "must be licensed under applicable State and local law." 42 U.S.C. § 1396r(d)(2)(A). As noted above, Legacy Village is not licensed as a nursing care institution. Thus, even if Legacy Village meets this definition, the state and federal statutes would simply provide conflicting indications on the matter, which is further evidence of ambiguity. To be clear, however, the Court finds none of these definitions on point because the Policy contains no indication that any statutory definitions were meant to apply.

- 9 -

1 applies, it weighs against permitting Defendant to rely on the lack of an explicit definition
2 of the term "nursing facility" to deny coverage.

3 The third factor, the transaction as a whole, also does not resolve the ambiguity. In
4 fact, the transaction between Ms. Davidson and the agent who sold her the Policy suggests
5 that the Policy was intended to apply much more broadly than Defendant now argues. The
6 record contains the agent's response to a complaint filed against her by Plaintiff with the
7 Arizona Department of Insurance, in which the agent states that Ms. Davidson wanted
8 "substantial coverage for nursing home care and assisted living care," that "[the agent's]
9 understanding of someone's home[] would mean where a person resides," and that "if [Ms.
10 Davidson] should ever need assisted living or nursing home care, it was [the agent's]
11 understanding that it could be made available to her." (Dkt. # 38 Ex. S.) This suggests that
12 the agent understood the term "home" as used in the Policy to be *any* place the policyholder
13 resides, including a "nursing home," and that coverage would therefore be available even in
14 a nursing facility. It can be further inferred that the agent explained the Policy according to
15 this understanding, for the Policy application itself provides that the agent explained the
16 scope of coverage to Ms. Davidson. Thus, the transaction as a whole suggests that Defendant
17 understood the term "nursing facility" to have a significantly broader scope than what it now
18 asserts.[5]

19 Defendant produces nothing about the transaction as a whole, or the Policy language
20 itself, to weigh in its favor. Defendant – apparently in an attempt to explain its simultaneous
21 positions that "Assisted Living Facilities are Nursing Facilities as contemplated by the
22 Policy" (Dkt. # 29 Ex. R. at 5), yet that Merrill Gardens, an assisted living facility, is not a

---

[5]Plaintiff argues, based on this evidence, that Ms. Davidson had a reasonable expectation of coverage. In light of the unresolvable ambiguity in the Policy, the Court need not reach the parties' arguments regarding the doctrine of reasonable expectations.

The parties also discuss another policy offered by Defendant, which uses (and defines) the term "nursing home." (*See* Dkt. # 38 Ex. Q at 573.) This is not helpful in defining the term "nursing facility" as used in the Policy. Thus, the Court attributes no significance to the definition of "nursing home" in Defendant's other policy.

- 10 -

1  "nursing facility" under the Policy – argues that Legacy Village is a "nursing facility"
2  because it provides "directed care" and lacks an "independent living" section (unlike,
3  ostensibly, Merrill Gardens). Defendant does not define what the terms "independent living"
4  and "directed care" mean, but according to state statute "directed care" is provided in an
5  assisted living facility and not a nursing care institution. *Compare* Ariz. Rev. Stat. § 36-
6  401(A)(8) *with* Ariz. Rev. Stat. § 36-446(8). Those terms are irrelevant in any event because
7  they have no basis whatsoever in the Policy or the transaction as a whole. The Policy does
8  not contain those terms and there is no evidence in the record suggesting that Ms. Davidson
9  was informed that she could only move into facilities that offer "independent living" but not
10  "directed care." Moreover, there is nothing in the Policy or the transaction that would forbid
11  coverage if an assisted living facility provides "directed care"; indeed, there is no indication
12  that a "home for the retired or aged" could not provide such care, yet those facilities are
13  explicitly covered under the Policy. Thus, Defendant's argument seems to run counter to the
14  Policy's language, and it certainly does not provide a basis on which to resolve ambiguity
15  in Defendant's favor.

16  In sum, none of the three factors resolve the ambiguity inherent in the term "nursing
17  facility" – and to the extent that they are relevant to the inquiry, they weigh against
18  Defendant's proposed construction of the term. Because "ambiguity remains after
19  considering these factors, we construe [the term] against the insurer." *First Am.*, 218 Ariz.
20  at 397, 187 P.3d at 1110. The Court therefore denies Defendant's motion for summary
21  judgment and grants Plaintiff's motion for partial summary judgment on counts one and two
22  of the Complaint. Pursuant to that grant of partial summary judgment, the Court hereby
23  issues a declaratory judgment that Ms. Davidson is entitled to receive
24  Homemaker/Companion Care benefits pursuant to the Policy.

25  The only remaining issue on these counts is the amount of Plaintiff's damages for
26  breach of contract. As Defendant points out – tersely, but sufficiently (*see* Dkt. # 34 at 8-9)
27  – there is conflicting evidence in the record regarding the amount Ms. Davidson paid for
28  health care services. Specifically, there is a tenant ledger in the record that segregates health

1 care costs from rent for the period between June 1, 2006, and April 1, 2007.  (Dkt. # 29 Ex.
2 H at 6-7.)  That ledger provides that Legacy Village charged $625 per month for rent and
3 $3070 per month for care costs, in addition to miscellaneous supply expenses.  (*See id.*)
4 However, the Executive Director of Legacy Village subsequently signed an affidavit stating
5 that Ms. Davidson pays $3695 each month, of which seventy percent (or $2586.50) is for
6 care costs and thirty percent (or $1108.50) is for "other services provided, such as rent, cost
7 of food, laundry services, activities, etc."  (Dkt. # 29 Ex. K at 1-2.)  A rational jury could find
8 a conflict between these two pieces of evidence, and thus entry of summary judgment for a
9 specific amount of damages is not proper.[6]

### B. Breach of the Covenant of Good Faith and Fair Dealing

Defendant argues that Plaintiff cannot make out a claim for breach of the implied covenant of good faith and fair dealing because Defendant had a reasonable basis for denying Plaintiff's claim. (Dkt. # 25 at 12-14.)  "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986)). "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. . . . It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy."  *Id.* at 238, 995 P.2d at 280.

"Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" *Id.* (quoting *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 509, 838 P.2d 1265, 1270 (1992)); *see also Beaudry v. Ins. Co. of the West*, 203 Ariz. 86, 91, 50 P.3d 836, 841 (Ct. App. 2002) ("[A] party may breach its duty of good faith without actually breaching an express covenant in the

---

[6]The Court reserves judgment on Plaintiff's request for pre-judgment interest and attorneys' fees until the resolution of the damage amount.

- 12 -

1  contract.") (internal quotations and ellipses omitted). "The tort of bad faith arises when the
2  insurer 'intentionally denies, [or] fails to process or pay a claim without a reasonable basis.'"
3  *Zilisch*, 196 Ariz. at 237, 995 P.2d at 279 (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz.
4  188, 190, 624 P.2d 866, 868 (1981)). On summary judgment, then, "[t]he appropriate inquiry
5  is whether there is sufficient evidence from which reasonable jurors could conclude that in
6  the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and
7  either knew or was conscious of the fact that its conduct was unreasonable."[7] *Id.*

8  In this case, a reasonable jury could make such a conclusion. Plaintiff has adduced
9  evidence that throughout the claims process, which took over a year, Defendant repeatedly
10 denied Plaintiff's claim, or at the very least made statements suggesting that the claim was
11 invalid, only to change its mind later and offer a new basis for denying payment. Although
12 Defendant disputes Plaintiff's characterization of this course of conduct, Defendant's actions
13 nevertheless could be construed by a reasonable jury as setting up a series of "needless
14 adversarial hoops" through which Plaintiff was forced to jump. *See id.* at 238, 995 P.2d at
15 280 (finding that there was sufficient evidence from which a jury could find that an insurer
16 "acted unreasonably and knew it" because it took around a year to work through the claims
17 process, which the court found could be construed as "an unreasonable length of time to
18 evaluate [the policyholder's] claim"); *see also Young v. Allstate Ins. Co.*, 296 F. Supp. 2d
19 1111, 1119-20 (D. Ariz. 2003) (denying summary judgment in a case in which there was
20 evidence that the insurance company had elongated the claims process). Summary judgment
21 therefore is not appropriate on this aspect of Plaintiff's suit.

---

[7] "[E]ven if as a result of a claim being fairly debatable Defendant is not liable for bad faith for failing to pay the claim immediately, Defendant might still be liable for bad faith if Defendant was unreasonable in processing the claim after the initial refusal to pay." *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003) (interpreting Arizona law).

**C.     Punitive Damages**

Defendant argues that Plaintiff is not entitled to punitive damages because there was a legal basis for denying coverage under the Policy.  (Dkt. # 25 at 14-15.)  The Court disagrees, although not for the reason Plaintiff suggests.  Plaintiff states that "because [Defendant] breached the contract, a trier of fact must make [a] determination regarding Plaintiff's claim[] . . . for Punitive Damages."  (Dkt. # 36 at 17.)  Plaintiff's argument along those lines is incorrect.  First, punitive damages would arise out of Plaintiff's tort claim, not her suit for contract damages.  *See In re Marriage of Benge*, 151 Ariz. 219, 224, 726 P.2d 1088, 1093 (Ct. App. 1986) (explaining that "punitive damages may not ordinarily be assessed in contract actions" but that they "may be recoverable where the breach of contract constitutes a tort"); *Lerner v. Brettschneider*, 123 Ariz. 152, 156, 598 P.2d 515, 519 (Ct. App. 1979) ("[A]lthough punitive damages do not lie for breach of contract, they are recoverable where the breach of contract constitutes a tort."); *cf. Beaudry*, 203 Ariz. at 92, 50 P.3d at 842 (explaining the circumstances in which actions to recover under insurance contracts sound in tort or in contract, and treating punitive damages as tort damages). Second, even if Plaintiff were relying on the Court's determination that there is evidence of bad faith sufficient to survive summary judgment, Plaintiff's argument would still not be correct, for "punitive damages may not be awarded in a bad faith tort case unless the evidence reflects 'something more' than the conduct necessary to establish the tort." *Rawlings*, 151 Ariz. at 161, 726 P.2d at 577.  Thus, the mere fact that Plaintiff has prevailed on her contract claim, or that her bad faith claim survives summary judgment, would not inherently establish that the claim for punitive damages also survives.

However, the Court still finds that summary judgment is not appropriate on the claim for punitive damages.  For punitive damages, there must be evidence from which a jury could reasonably infer "that the evil hand that unjustifiably damaged the objectives sought to be reached by the insurance contract was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured." *Filasky v. Preferred Risk Mut. Ins. Co.*,

1  152 Ariz. 591, 598, 734 P.2d 76, 83 (1987); *see also Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 ("There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton.") (emphasis omitted). The Arizona Supreme Court has explained that the requisite "evil mind" may be evinced by "fraudulent conduct and 'deliberate, overt and dishonest dealings.'" *Rawlings*, 151 Ariz. at 163, 726 P.2d at 579 (quoting *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 8, 699 P.2d 376, 383 (Ct. App. 1984)).

Here, the evidence of Defendant's repeated denials and quasi-denials, and the ever-shifting theories on which those denials were based, would permit a jury to reasonably infer Defendant's malicious intent.  Construed as Plaintiff advances, there is evidence that Defendant engaged in a year-long process of advancing one theory for denying Plaintiff's claim, waiting for Plaintiff to counter that theory, and then abandoning it in favor of yet another theory – all the while retaining the benefit of Ms. Davidson's policy payments. Such a practice presents the reasonable inference that Defendant's conduct was fraudulent, and that Defendant deliberately, overtly, and dishonestly ignored a legitimate claim merely to advance its own pecuniary interest. *See Rawlings*, 151 Ariz. at 163, 726 P.2d at 579; *Farr*, 145 Ariz. at 8, 699 P.2d at 383.  Therefore, summary judgment is not appropriate on the punitive damages claim.

## CONCLUSION

Summary judgment is appropriate on counts one and two of the Complaint in favor of Plaintiff, although not for a specific damage amount.  There remain genuine issues of material fact regarding Plaintiff's claims for breach of the covenant of good faith and fair dealing, as well as the punitive damages claim, and thus summary judgment is not appropriate on the remaining counts.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 25) is **DENIED**.

1  **IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment
2  (Dkt. # 26) is **GRANTED IN PART** and **DENIED IN PART**.
3  DATED this 2nd day of March, 2009.

*G. Murray Snow*
G. Murray Snow
United States District Judge